**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

NORTHEAST BIOFUELS, LP, *et al.*,

Case no. 09-30057
Chapter 11 Case
(Main Case)

## RESPONSE TO AMENDED OBJECTION TO ALLOWANCE OF A PORTION OF CLAIM NO. 62 AND TO ALLOWANCE OF DUPLICATE CLAIM NO. 63 FILED BY NOBLE AMERICAS CORP.

Noble Americas Corp. ("Noble"), by and through its undersigned counsel, hereby submits its verified response to the objection of the Official Committee of Unsecured Creditors (the "Committee") to the proof of claims timely filed by Noble in the above-referenced case (Claim Numbers 62 and 63) and in connection therewith states as follows:

### BACKGROUND

1. On January 27, 2005, the Chapter 11 debtor, Northeast Biofuels, LLC (the "Debtor") entered into that certain Ethanol Purchase and Sale Agreement with Noble (the "Agreement") under which the Debtor agreed to sell and Noble agreed to purchase all of the ethanol produced by the Debtor on the terms and conditions contained within the Agreement. A true and correct copy of the Agreement is attached hereto as Exhibit A and incorporated herein.

2. The Agreement is a purchase and sale agreement for ethanol produced by the Debtor's 100,000,000 gallon per year ethanol plant located in Fulton, New York. The Agreement is a standard agreement in the ethanol industry. Under the Agreement, the Debtor was obligated to sell and deliver to Noble ethanol that it produced. The Debtor was obligated

under the Agreement to pay and reimburse Noble for (1) all transportation costs, <u>including the costs of dedicated railtank car fleet procured and maintained for the Debtor's benefit under the Agreement as well as associated costs such as leasing costs</u> and costs of maintenance, repair freight, insurance, railcar storage, demurrage, detention, tracking, cleaning and inspection; (2) terminalling and port costs; (3) actual tariffs and duties paid by the Purchaser; and (4) any other bona fide, verifiable and documented third party costs and expenses incurred by Noble under the Agreement. *See* Article 7 of the Agreement. Finally, the Debtor was obligated to pay Noble's Marketing and Distribution Fee. After paying these direct costs under the Agreement, the Debtor was left with the Purchase Price for the sale of its ethanol. *See* Article 7.1 and Article 10.1.

3. On January 14, 2009 (the "Petition Date"), the Debtor and certain of its affiliates (collectively, the "Debtors") filed separate, voluntary petitions for relief under chapter 11 of title 11, U.S.C. §§ 101 *et seq.*, as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of New York (the "Court").

4. On July 28, 2009 the Court entered an Order granting the Debtors' First Omnibus Motion Pursuant to Section 365(a) of the Bankruptcy Code and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure for Authorization to Reject Certain Executory Contracts and Unexpired Leases. The Agreement was among the numerous executory contracts or unexpired leases that were rejected by the Debtors on that date. On August 19, 2009 and August 24, 2009, Noble timely filed proof of claims in the Debtor's case in the amount of $9,995,239.24. *See* Claim Numbers 62 and 63, which are a part of the Court's file and incorporated herein (the "Claim"). Noble's Claim consists of: (i) $863,780.72 for outstanding accounts receivables owed to Noble by the Debtor, (ii) $715,040.52 of accrued receivables for railcar charges; and (iii) $8,416,418.00 for damages associated with future railcar charges that Noble has incurred under

the Agreement and will continue to incur under the respective railcar leases. Based upon documentation Noble has provided to the Committee, Noble understands that the Committee has agreed to the allowance of portions (i) and (ii) of the Claim described above and no objection remains as to those portions of the Claim. Noble further understands that the Committee's remaining concern is the mitigation of losses Noble is experiencing with respect to part (iii) of the Claim above, the future railcar damages.

## DISCUSSION

5. Federal Rule of Bankruptcy Procedure 3001(f) provides that starting point for determining who carries the burden when a proof of claim is filed. A proof of claim filed in accordance with the Bankruptcy Rules "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). "The interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by substantial evidence." *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993); *see also Reilly v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000) (*citing In re Barclay Bros.*, 1986 WL 15884, at *2 (Bankr. E.D. Pa. Feb. 6, 1986) ("[U]pon the filing of objections, the trustee is then called upon to produce evidence that must be of a probative force equal to that of the allegations of the creditor's proof of claim.") (citation omitted). Here, the Committee has failed to produce any substantial evidence to overcome the presumption of validity given to Noble's claim. However, in the event that the Court finds that the Committee has overcome the presumption of validity of Noble's Claim, Noble has shown in its Claim documents, and explained below, that it has carried its burden of proof with respect to its Claim.

3

6. Pursuant to § 365(g) of the Bankruptcy Code, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease. *See* 11 U.S.C. § 365(g). The Agreement was rejected by the Debtors and Noble's claim was, accordingly, calculated with respect to damages resulting from a breach of the Agreement. Noble has incurred and will continue to incur substantial losses (including millions of dollars in out-of-pocket costs) as a result of the Debtor's rejection of the Agreement. Under the Agreement (and consistent with industry practice), Noble was obligated to enter into lease arrangements for having a dedicated fleet of railcars available to the Debtor. Article 8.1 states:

> Purchaser agrees to diligently pursue, secure and maintain all necessary agreements to transport the Ethanol from the Delivery Point. Purchaser shall be solely responsible for the arrangement for the transportation. Purchaser shall lease a designated rail car fleet for the removal and delivery of the Plant's Ethanol production. The number of rail cars in the fleet shall be reviewed and approved by the Marketing Committee [**which committee includes representatives of the Debtor**]. The Marketing Committee shall provide written approval of the fleet size to Purchaser. Purchaser covenants to use its best efforts to obtain the best commercially reasonable prices in respect of transportation such that Producer achieves the highest Net Price possible after payment for Transportation Costs.

Noble did this and entered into agreements on the Debtor's behalf and in accordance with the requirements under the Agreement for the lease of (i) 52 railcars for a term of 7 years and ending in February, 2015 ("UTLX") and (ii) 148 railcars for a term of 5 years and ending in March 2013 ("CIT")[1]. The monthly lease expense for the railcars, which Noble is *required* to pay each and every month since the Debtor rejected the Agreement, is $39,000.00 for the UTLX lease and $119,140.00 for the CIT lease totaling a *$158,140.00* monthly railcar expense.

---

[1] Noble has provided Committee counsel with true and correct copies of the CIT and UTLX leases, and due to the confidentiality of such leases a summary of the lease expenses is attached hereto as Exhibit B.

4

Attached and incorporated hereto as <u>Exhibit B</u> and made a part hereto is a summary of monthly out-of-pocket expenses Noble is required to pay as a result of the rejected Agreement. Noble's Claim includes amounts related to "Total Monthly Lease Costs" in the amount of $158,140.00 per month. Noble's Claim (at this point) <u>does not</u> include amounts related to "Total Monthly Storage Fees" in the amount of $8,460.00 per month although under the Agreement those costs are recoverable as well. *See* Exhibit B and Article 7.3. The Aggregate amount of total lease expenses is $8,416,418.00

7. Article 18.6 of the Agreement provides that the Agreement shall be construed in accordance with and governed by the law of the State of New York. As such, "as with contract rejections in general, damages are ... calculated according to state law." *See In re Old Carco LLC*, 406 B.R. 180, 199 (Bankr. S.D.N.Y. 2009). Under New York law "[d]amages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed." *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 692 N.E.2d 551, 553 (1998). It is clear from its Claim that Noble is not, even seeking its full measure of damages in this case, which would include a claim for lost profits. *See* U.C.C. §§ 2-711, 2-712 and 2-713; *see also* Exhibit B (Monthly Storage Fees not included in Proof of Claim calculation). Noble is seeking a claim for damages that will make it whole with respect to expenses the Agreement required Noble to incur and as a result of the Debtor's rejection of the Agreement. Article 17.1(e) of the Agreement specifically provides that **"[e]ach Party shall be entitled to all direct damages ... upon the default or other failure to perform of the other Party."**

8. Since the date the Committee filed the objection Noble has been working with the Committee's counsel by providing documentary support for the Claim and also documentation of

5

mitigation efforts made by Noble. It is Noble's understanding that the Committee's sole remaining issue to be determined is the issue of mitigation. The Committee has, upon information and belief, already acknowledged the allowance for $863,780.72 representing outstanding accounts receivable owed to Noble by the Debtor and $715,040.52 representing accrued receivables relating to the railcar charges. As such no dispute exists as to this portion of the Claim.

9. The following table shortly summarizes Noble's claim.

| | |
|---|---|
| Outstanding Accounts Receivable (Not objected to) | $863,780.72 |
| Accrued Receivables (Rail Car Charges) (Not objected to) | $715,040.52 |
| Future Rail Car Lease Expenses (Objected to by the Committee) | $8,416,418.00 |
| Actual Mitigation from July 28, 2009 through February 17, 2010 | ($139,541.67) |
| Potential Future Mitigation of Noble[2] | ($738,210.00) |
| Total Claim | $9,117,487.57 |

10. The Committee disputes that Noble is entitled to damages for future railcar lease charges in the amount of $8,416,418.00 on the basis that under Article 8.1 of the Agreement, Noble, the purchaser, shall be solely responsible for the arrangement of transportation. Article 8.1 of the Agreement obligates Noble to secure and maintain all necessary agreements so that the Debtor may have the benefit of a dedicated railcar fleet. The Committee asserts that Noble's

---

[2] Amount is not reduced for Monthly Storage Charges Noble is certain to incur into the future. *See* Exhibit B, Monthly Storage Fees.

6

obligation to "secure" and "maintain" agreements with third parties so that the Debtor had a readily accessible fleet of railcars somehow shifts formal responsibility to Noble. This contention is without merit, misconstrues the Agreement, defies logic and inappropriately shifts the risk of loss in the event of a default by the Debtor or Noble. Pursuant to Article 7.1 of the Agreement, the Purchase Price due to the Debtor is determined by *reducing* the actual gross price by the expenses contained in Article 7.3 of the Agreement. Transportation Costs are an expense used to calculate the Purchase Price due to be "paid" to the Debtor. The obligations for such charges under the Agreement rest upon the Debtor, accordingly, transportation costs are direct damages recoverable by Noble under the Agreement.

11. Under New York law, "the damages recoverable for a breach of contract are meant 'to place the nonbreaching party in as good a position as it would have been had the contract been performed'." *Manas v. VMS Assocs., LLC*, 53 A.D.3d 451, 454, 863 N.Y.S.2d 4, 7 (N.Y. App. Div. 2008). The Debtor is obligated to pay the transportation costs, among other charges contained in Articles 7.3 and 7.4 of the Agreement. Placing Noble in as good a position as it would have been had the contract been performed requires that the Debtor pay the transportation expenses Noble was forced to incur under the Agreement. *See Harry Kolomick Contractors, Inc. v. Shelter Rock Estates, Inc.*, 172 A.D.2d 492, 492, 567 N.Y.S.2d 845, 846 (N.Y. App. Div. 1991) (*citing Lieberman v. Templar Motor Co.*, 236 N.Y. 139, 149, 140 N.E. 222, 225 (1923) (Damages include also losses sustained ... reasonably made in part performance of the contract, to the extent that they are wasted if performance is abandoned).

12. The Committee's reliance on Article 10.3 of the Agreement is also misplaced. Article 10.3 provides:

7

> The Debtor shall pay to Noble the Fee in the amounts set forth in Section 7.4 above ...[t]he Fee will be paid through deductions by Noble from remittances to the Debtor hereunder.

Article 7.4 defines the Fee as a Marketing and Distribution Fee (Noble's lost profit) on sales to its customers in payment for its activity and its obligations under this Agreement. The Committee's asserts at paragraph 20 of its objection that "Noble will not need to incur any transportation expenses because it will not be purchasing ethanol from the Debtors." This result is irreconcilable with the fact that the Debtor's Agreement requires Noble to enter into long-term leases and to obtain the best commercially reasonable prices for a dedicated railcar fleet that is used to transport the Debtor's ethanol production. If, as the Committee asserts, transportation costs are the sole responsibility of Noble, why then does the Debtor require Noble "to obtain the best commercially reasonable prices in respect of transportation such that Producer achieves the highest Net Price possible after payment for Transportation Costs." Finally, Noble is not asserting claims for lost profits, which it is also entitled to, it is only seeking the recovery of actual out-of-pocket railcar lease expenses that flow from the Debtor's breach of the Agreement.

13. The Committee also asserts that Noble has made an insufficient effort to mitigate its losses. As a result of the $158,140.00 Noble is paying each month for the railcar leases Noble is intensely motivated to mitigate its losses in this case. Noble has been and continues to make reasonable efforts to mitigate its losses resulting from the rejected Agreement. The Committee asserts that Noble could have breached its agreements with the lessors of the railcars. However, "while a party injured by a breach of contract has a duty to make 'reasonable exertions' to mitigate or minimize the damages liable to result therefrom ... such obligation does not require a party to incur extraordinary expense and risk." *Murray v. N.Y. City Transit Auth.*, 862 N.Y.S.2d 706 (N.Y. Sup. App. Term 2008). Noble is not required, in the name of mitigation of losses, to

8

breach its leases with the railcar lessors and incur for itself maximum breach of contract damages.

14. The Committee's focus on the cost to the Debtor's estate with respect to the mitigation of damages by Noble is misplaced. "[T]he non-breaching party is required to mitigate its own injuries ... not potential injury to the breaching party." *Clark Oil Trading Co. v. J. Aron & Co.*, 256 A.D.2d 196, 199, 683 N.Y.S.2d 12, 15 (N.Y. App. Div. 1998). The issue of mitigation of damages focuses on Noble's injury and not the potential damages to the Debtor. Noble has made and continues to make more than reasonable efforts to mitigate its own injuries with respect to the Debtor's rejection of the Agreement.

15. The Committee speculates about the naked possibility of future mitigation in this case. Noble has attempted to address the Committee's concern by agreeing to reduce its claim in the aggregate amount of $877,751.67 which is comprised of $139,541.67 (the "Actual Mitigation") and $738,210.00 (the "Potential Future Mitigation"). *See* ¶9 above. Uncertain and contingent possibilities cannot be taken into consideration in mitigation of damages. *See* 25 C.J.S. Damages § 167 (*citing Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 590 (2d Cir. 1961)). Furthermore, the Committee has provided no support for what Noble's future and speculative mitigation may be. The uncertainty with respect to the possibility that Noble may further mitigate its losses must fall on the Debtor in this case. Uncertain mitigation possibilities cannot be taken into account when determining the amount of mitigation Noble has undertaken. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265, 66 S. Ct. 574, 580 (1946) (a breaching party bears the risk of any uncertainty as to the amount of damage) (internal citations omitted). Although the law is clear with respect to speculative and uncertain mitigation amounts, Noble will give the Debtor the most charitable benefit of the doubt and hypothetically extend the

monthly revenue it has currently received under its month-to-month sublease agreements for the entire duration of the original lease term thereby arriving at the Potential Future Mitigation amount. Noble does not believe that it will mitigate its losses, given the current depressed state of the market for railcars, to the extent it has agreed to give the Future Mitigation credit to the Debtors.

16. The market for ethanol railcars is utterly and completely saturated. On April 7, 2009 Aventine Renewable Energy Holdings, Inc. and its affiliates filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. *See* Bankruptcy Case No. 09-11214. Aventine was one of the country's largest ethanol producers and ethanol marketing companies. Verasun Energy Corporation, a leading producer of 1.4 billion gallons of ethanol annually also filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware in October 2008. *See* Bankruptcy Case No. 08-12606. Aventine and Verasun are only representative, many other bankruptcies, similar to the Debtors, have occurred in the ethanol market. Large fleets of ethanol railcars were constructed during the ethanol boom that took place prior to the large bankruptcies. As a result, the excess supply of ethanol railcars vastly outweighs their corresponding demand making mitigation of damages resulting from the Debtor's rejection of the Agreement difficult, even though Noble has taken aggressive steps to re-lease the railcars that were previously devoted to the Debtor's use.

17. The efforts of Noble include entering into a number of sub-lease agreements which have generated $139,541.37 in mitigation of losses suffered by Noble for the period of July 28, 2009 through February 17, 2010. The sub-lease agreements from which Noble is receiving the mitigation payments are on a month-to-month basis and for a price that is significantly less for which Noble leased the railcars. There is a significant risk that such month-

Doc# 3169328\1

to-month leasing of the railcars could abruptly end, further limiting Noble's ability to mitigate any of its losses.

18. Noble has at least one full-time employee who devotes 50% of their time to just managing rail and placing railcars. Noble has made and continues to make reasonably efforts to mitigate its losses. Accordingly, Noble's claim should be allowed in an amount that takes into account Noble's mitigation efforts and credits to the Debtor $139,541.67 against the $8,416,418.00 railcar lease damages portion of the Claim.

WHEREFORE, based upon the foregoing, Noble Americas Corp., respectfully requests that the Court overrule the Committee's Objection and enter an Order:

a. allowing Noble Americas Corp. a general unsecured claim in the amount of $9,117,487.57, and

b. awarding such other and further relief as the Court deems just and proper.

Doc# 3169328\1

Dated: February 18, 2010  **COSTELLO, COONEY & FEARON, PLLC**

By: _____
    Anthony R. Hanley, Esq. (#505498)
5701 West Genessee Street
Camillus, NY 13031
Telephone: 315-422-1152
Fascimile: 315-422-1139
E-Mail: arh@ccf-law.com

**ATTORNEYS FOR
NOBLE AMERICAS CORP.**

-AND-

**LINDQUIST & VENNUM PLLP**

    George H. Singer (#0262043)
    Adam C. Ballinger (#389058)
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612-371-3211
Fascimile: 612-371-3207
E-Mail: gsinger@lindquist.com
E-Mail: aballinger@lindquist.com

**ATTORNEYS FOR
NOBLE AMERICAS CORP.**

Doc# 3169328\1

## VERIFICATION

I, Theodore W. Robinson, Executive Vice President of the Noble Americas Corp., declare under penalty of perjury that the facts set forth in the preceding *RESPONSE TO AMENDED OBJECTION TO ALLOWANCE OF A PORTION OF CLAIM NO. 62 AND TO ALLOWANCE OF DUPLICATE CLAIM NO. 63 FILED BY NOBLE AMERICAS CORP.* are true and correct according to the best of my knowledge, information and belief.

Executed on: February 18, 2010

Theodore W. Robinson