(c) <u>Events of Default of Purchaser</u>. Unless the following acts or occurrences are cured within thirty (30) days after the date of written notice from PRODUCER as provided for in Section 17.1(a), such acts or occurrences shall constitute Events of Default of Purchaser; <u>provided that</u>, if any such act or occurrence cannot be cured within thirty (30) days with exercise of due diligence, and if Purchaser within such period submits to PRODUCER a plan reasonably designed to correct the default within a reasonable additional period of time, then an Event of Default shall not exist unless and until Purchaser fails to pursue diligently such cure or fails to cure such default within the additional period of time specified by the plan or 90 days, whichever occurs first:

(1) Purchaser's failure to make any payment of any undisputed portion of any invoice or any other statement of amounts due hereunder sent by PRODUCER within fifteen (15) days after receipt thereof;

(2) Purchaser's dissolution or liquidation;

(3) Purchaser's general assignment of this Agreement or any of its rights hereunder for the benefit of its creditors, provided that, the foregoing shall not be grounds for default if, pursuant to applicable law and with any required court approval, this Agreement is assumed by a creditworthy trustee, assignee or receiver, who promptly provides adequate assurance and evidence reasonably satisfactory to PRODUCER of the capacity to continue Purchaser's obligations under this Agreement;

(4) The Purchaser's filing of a petition for, or other commencement, authorization or acquiescence in the commencement of, a proceeding or cause under any bankruptcy or similar law for the protection of creditors;

(5) The filing of a case in bankruptcy or any proceeding under any other insolvency law against Purchaser as debtor, which case is not vacated within forty-five (45) days of filing, provided, however, that the foregoing shall not be grounds for default if, pursuant to applicable law and with any required court approval, this Agreement is assumed by an assignee who promptly provides adequate assurance and evidence reasonably satisfactory to PRODUCER of the capacity to perform Purchaser's obligations under this Agreement;

(6) Purchaser's assignment of this Agreement or any of its rights under the Agreement without obtaining PRODUCER's prior written consent to the extent required under this Agreement; provided in no event, however, will any assignment by Purchaser of this Agreement to an Affiliate or to

EXECUTION COPY

any bank or other financial institution providing Purchaser with financing be deemed a breach or failure of this provision; or

(7) Except for failures provided for in the other subparagraphs of this Section 17.1, Purchaser's material breach of any material obligation of Purchaser under this Agreement, unless such failure is excused pursuant to Article XIII or any other provision of this Agreement.

(d) Termination. The failure of a party to timely cure in accordance with Section 17.1(b) or Section 17.1(c), or any other provision of this Agreement, shall constitute an Event of Default hereunder and the non-defaulting Party may, upon written notice to the other Party, terminate this Agreement. Neither Party shall have the right to terminate this Agreement except as provided for upon the occurrence of an Event of Default as describe above or as otherwise may be explicitly provided in this Agreement. Notwithstanding such termination, the defaulting party shall remain liable for the payment of all monies due the non-defaulting party under the terms of this Agreement.

(e) Calculation of Damages. Each Party shall be entitled to all direct damages and other rights and remedies available at law or in equity, except as may be provided otherwise in this Agreement, upon the default or other failure to perform of the other Party.

## ARTICLE XVIII
## MISCELLANEOUS

18.1 Non-Waiver of Future Default. No waiver by either party of any default by the other party in the performance of any of the provisions of this Agreement will operate or be construed as a waiver of any other or future default or defaults, whether of a like or of a different character.

18.2 Assignment. Neither party may assign this Agreement or any of its rights hereunder without the prior consent in writing of the other, which consent may not be unreasonably withheld or delayed. A change in ownership of Purchaser or PRODUCER will not be construed to be an assignment for the purposes of this Section 18.2. Notwithstanding the foregoing, as security for its obligation to its financing sources either party may (with prior written notice to the other party) assign this Agreement, with the right to cure defaults of the assigning party, to its financing sources as they may require from time to time, and it is understood by the parties hereto that PRODUCER, will, concurrently with or subsequent to the execution hereof, assign its rights hereunder to its senior lender.

18.3 Interpretation and Fair Construction of Contract. This Agreement has been reviewed and approved by each of the parties. PRODUCER and Purchaser have each participated in the negotiation of this Agreement, have proposed language incorporated within this Agreement, and have otherwise been instrumental in the drafting of this Agreement. Each party has been represented by legal counsel in the negotiation and drafting of this Agreement, and has had

ample opportunity to confer with that counsel. Therefore, in the event that it should be determined that any provision of this Agreement is uncertain or ambiguous, the language in all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly construed for nor against any party. The parties agree that the contract, and any of its provisions, shall not be construed against any party as its drafter.

18.4 Document. Each party to this Agreement shall perform any and all acts and execute and deliver any and all documents as may be necessary and proper under the circumstances in order to accomplish the intents and purposes of this Agreement and to carry out its provisions.

18.5 Time. Time is of the essence with respect to the performance of each of the covenants and agreements herein set forth.

18.6 Governing Law. This Agreement shall be construed in accordance with and governed by the law of the State of New York determined without reference to the principles of conflicts of laws (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

18.7 Jurisdiction. Each of the parties hereto agrees to submit to the exclusive jurisdiction of all Federal and New York State Courts located in the City of New York, New York solely for any legal proceeding arising from this Agreement and consents that personal jurisdiction may be obtained over such party by mailing a summons by registered mail or certified mail, return receipt requested, within or without such court's jurisdiction, or by personal service, provided a reasonable time for appearance is allowed

18.8 Enurement. This Agreement will enure to the benefit of and be binding upon the respective successors and permitted assigns of the parties.

18.9 Entire Agreement. This Agreement constitutes the entire agreement between the parties with respect to the subject matter contained herein and any and all previous agreements, written or oral, express or implied, between the parties or on their behalf relating to the matters contained herein are hereby terminated and canceled.

18.10 Notices. Except as herein otherwise provided, each notice, request, demand, statement, report and bill which must or may be given pursuant hereto will be in writing and may be mailed by prepaid first class mail (or equivalent), delivered by hand or sent by telecopier to the address or number indicated below:

if to PRODUCER:

>Northeast Biofuels, LLC
>1850 County Route 57
>Fulton, New York 13069
>Attention: Eric W. Will, II, Manager
>Fax number: (315) 449-2861

And

    Hancock & Estabrook, LLP
    1500 MONY Tower I
    P.O. Box 4976
    Syracuse, New York 13221-4976
    Attention: Richard W. Cook, Esq.
    Fax number: (315) 471-3167

if to Purchaser:

    Noble Americas Corp.
    333 Ludlow Street, Suite 1230
    Stamford, CT 06902
    Attention: Ethanol Contract Administration
    Fax number: (203) 326-6505

And

    Noble Americas Corp.
    99 South Raymond Ave., Suite 105
    Pasadena Ca. 91105
    Attention: Ethanol Contract Administration
    Fax number: (626) 585-1952

The date of receipt of each such notice, demand or other communication will be the date of delivery thereof if hand delivered, or, if given by mail as provided herein, will be deemed conclusively to be the 5th day after the same is so mailed, except in the event of disruption of the postal service in which event the notice, demand or other communication will be deemed to be received only when actually received and, if sent by facsimile, be deemed to have been given or received on the first business day after it was so sent. Either party hereto may at any time and from time to time notify the other party in writing as to the change of address and the new address to which notice shall be given to it thereafter until further changed.

18.11 <u>Modification and Waiver</u>. There will be no modification of the terms and provisions hereof except by the mutual agreement in writing signed by the parties.

18.12 <u>Compliance with Laws</u>. This Agreement and the respective obligations of the parties hereunder are subject to present and future valid laws and valid orders, rules and regulations of duly constituted authorities having jurisdiction.

18.13 <u>Severability</u>. If any provisions of this Agreement shall be held to be invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not in any manner affect or render invalid or enforceable any other provision of this Agreement.



23



18.14 Furnishing of Information. The parties will, upon request, provide such additional information as may be reasonably required to allow the parties to efficiently and effectively carry out their respective obligations hereunder and to determine and enforce individual or collective rights under this Agreement.

18.15 Cumulative Remedies. Unless otherwise specifically provided herein, the rights, powers, and remedies of each of the parties provided herein are cumulative and the exercise of any right, power or remedy hereunder does not affect any other right, power or remedy that may be available to either party hereunder or otherwise at law or in equity.

18.16 Faithful Performance. The parties shall faithfully perform and discharge their respective obligations under this Agreement and endeavor in good faith to negotiate and settle all matters arising during the performance of this Agreement not specifically provided for.

18.17 Relationship of Parties. This Agreement creates no relationship between the parties hereto other than that of buyer and seller. The parties are performing services hereunder as independent contractors and there is no agency, partnership, employment, joint venture or other joint or mutual enterprise or undertaking created hereby. Nothing contained in this Agreement authorizes one party to act for or on behalf of the other and neither party is entitled to commissions from or to represent, bind or obligate the other except as set forth herein, nor shall this Agreement give rise to any fiduciary duty on the part of either party to the other party.

18.18 Costs. Each of the parties hereto shall pay its own costs and expenses incurred in the negotiation, preparation and execution of this Agreement and of all documents referred to in it and in carrying out the transactions contemplated hereby and thereby.

18.19 Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties to this Agreement had signed the same document and all counterparts will be construed together and constituted one and the same instrument.

18.20 Survival. All provisions of this Agreement which are expressly or by implication to come into or continue in force and effect after the expiration or termination of this Agreement shall remain in effect and be enforceable following such expiration.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written.

NOBLE AMERICAS CORP.
By: _____
Name: TRANJIO ZICHICHI
Title: EXECUTIVE VICE PRESIDENT

NORTHEAST BIOFUELS, LLC
By: _____
Eric W. Will, II, Manager

# SCHEDULE A

## NON-DETERGENT

| TEST | GRADE | METHOD OF TEST |
|---|---|---|
| Apparent Proof – 60 degrees F | 200 min. - 203 max. | Hydrometer |
| Specific Gravity, 60/60 degrees F | 0.7870-0.7950 | ASTM D –1298 |
| Water, Mass Percent | 0.50 min. - 0.80 max. | ASTM E-203 |
| Ethanol Content, Vol % | 92.1 | Gas Chromatography ASTM D-2 / E –44 , P170 Method, A or B |
| Methanol, (vol. %) | 0.5 max. | |
| Non-Volatile Matter, mg/100 mL | 5 max. | ASTM D-1353 |
| Chloride Ion Content, mg/L | 32 max. | ASTM D-512, Meth. C, Modified Note (1) |
| Copper Content, mg/kg | 0.1 max. | ASTM D-1688, Meth. D, Modified Note (2) |
| Acidity, mass %, (as acetic acid) | 0.007 max. | ASTM D-1613 |
| Appearance | Clear and Bright | Visual |
| Color, Platinum – Cobalt | 50.0 max. | ASTM D-1209 |
| Hydrocarbon Denaturant | 5.0 max. – 2.0 min. | Gas Chromatography |
| PHe | 6.5 min. – 9.0 max. | |
| Sulfur, ppm | 10 max. | |

Corrosion Inhibitor -- All denatured fuel ethanol will contain one of the following inhibitors:

- 20 pounds per 1,000 bbls of Octel America DCI-11*
- 20 pounds per 1,000 bbls of Petrolite Tolad 3222
- 20 pounds per 1,000 bbls of Petrolite Tolad 3224*
- 20 pounds per 1,000 bbls of Nalco 5403
- 20 pounds per 1,000 bbls of Nalco 5405
- 20 pounds per 1,000 bbls of Betz ACN 13
- 20 pounds per 1,000 bbls of Mid Continental MCC5011E

{H0383064.1}

\*Ootel DCI-11 or Petrolite Tolad 3224 will be used when pHe/acidity adjustments are needed.

If pHe adjustment is not necessary, any of the above corrosion inhibitors can be used.

Denatured fuel ethanol supplied to California will also meet CA ethanol requirements (see ASTM D-4806 Appendix X2.1).



EXECUTION COPY

## SCHEDULE B

The Net Price (NP) in U.S. dollars per U.S. Gallon, for sales of each lot of Ethanol shall be determined in accordance with the following formula:

$$NP = (GP - A - B - C - D) \times (1 - Z)$$

where:

GP = actual Gross Price that the Purchaser bills to its Customers, in U.S. dollars per Gallon for the lot of Ethanol sold to Customers;

A, B, C, D = actual unit costs in $/Gallon obtained by dividing respectively the amounts A1, B1 C1, and D1 defined at Section 7.3 above by the quantity of the subject lot;

Z = Marketing and Distribution Fee as set forth in Section 7.4 hereof

### Example:

| | |
|---|---|
| Third party sale price: (Gross Price) (GP) | $1.57/gallon |
| Less: Transportation Costs: (A) | $0.09/gallon |
| Less: Terminaling and port costs: (B) | $0.02/gallon |
| Less: Tariffs and duties: ( C) | $0.005/gallon |
| Less: Other costs: (D) | $0.005/gallon |
| Equals: Plant net-back price: | $1.45/gallon |
| Less Marketing Fee: (Z) | $0.0145/gallon ($1.45 x 1% or .01) |
| Equals: Net Price: (NP) | $1.4355/gallon |

3

NOVATION

This Novation Agreement, dated as of June 12, 2006, between NORTHEAST BIOFUELS, LLC, a New York limited liability company, NORTHEAST BIOFUELS, LLC, a Delaware limited liability company, and Noble Americas Corp., a Delaware corporation having its principal place of business at Stamford Harbor Park, 333 Ludlow Street, Suite 1230, Stamford, Connecticut 06902.

RECITALS

1. Noble Americas Corp. has entered into an Ethanol Purchase and Sale Agreement with NORTHEAST BIOFUELS, LLC, a New York limited liability company ("NORTHEAST NEW YORK") dated January 27, 2005 (the Agreement) for the purchase of all of the ethanol production of approximately one hundred million (100,000,000) Gallons of Ethanol per annum to be produced by NORTHEAST NEW YORK at a Plant to be located in Fulton, New York, on the terms and conditions set forth in the Agreement.

2. The parties are desirous of modifying, by way of novation, the names of the parties under the above Agreement, in order to substitute NORTHEAST BIOFUELS, LLC, a Delaware limited liability company ("NORTHEAST DELAWARE") in place of and as successor in interest to the aforesaid NORTHEAST NEW YORK under the Agreement, as Producer of the ethanol to be delivered under the aforesaid Agreement from the above Plant; subject, however, to NORTHEAST NEW YORK, remaining jointly and severally responsible for the performance of said Agreement, together with said NORTHEAST DELAWARE until the date of acquisition by NORTHEAST DELAWARE of all right, title and interest of NORTHEAST NEW YORK to the Plant and all related contracts, permits and other rights necessary to enable NORTHEAST DELAWARE to construct and operate the Plant and perform its obligations under the Agreement.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged by the parties, the parties agree as follows:

1. The parties do hereby substitute, by way of novation, NORTHEAST BIOFUELS, LLC, a Delaware limited liability company, in place of, and as successor in interest to, the aforesaid NORTHEAST BIOFUELS, LLC, a New York limited liability company, under the aforesaid Agreement; subject, however, to said NORTHEAST BIOFUELS, LLC, a New York limited liability company, remaining jointly and severally responsible for the performance of said Agreement, together with said NORTHEAST BIOFUELS, LLC, a Delaware limited liability company, until the date of acquisition by NORTHEAST DELAWARE of all right, title and interest of NORTHEAST NEW YORK to the Plant and all related contracts, permits and other rights necessary to enable NORTHEAST DELAWARE to construct and operate the Plant and perform its obligations under the Agreement..

1

3. Section 1 (k) of the aforesaid Agreement entitled "Definitions" shall be modified to read as follows:

   (k) "Canadian Sales Agreement" shall have the meaning set forth in Section 5.1(b).

4. Section 4.5 entitled "Marketing Committee" of the aforesaid Agreement shall be modified to read as follows:

   "Marketing Committee. A Marketing Committee (the "Marketing Committee") shall be formed as expeditiously as possible comprised of two representatives of PRODUCER and one or two representatives, at Purchaser's option, of the Purchaser. The CEO of PRODUCER, or other designee of PRODUCER, shall act as Chairman of the Marketing Committee. Both PRODUCER and Purchaser agree to operate within the guidelines of the Marketing Plan, as such Marketing Plan shall be amended from time to time."

5. Section 4.6 entitled "Duties of Marketing Committee" of the aforesaid Agreement shall be modified to read as follows:

   "The Marketing Committee shall meet on a regular basis, whether in person or by telephone conference call, and in no event less than twice a year. The Marketing Committee's functions shall include, but not be limited to: (i) reviewing market conditions; (ii) approving the Marketing Plan; (iii) reviewing the Marketing Plan on a regular basis, and, if appropriate, amending such Marketing Plan in light of changing market conditions (iv) consolidating the Marketing Plans submitted by the Purchaser into an overall joint marketing plan and determine acceptable ranges of netback value(s); (v) establishing coordination between the Purchaser and the PRODUCER by discussing and approving sales strategy proposed by Purchaser and by the PRODUCER; (vi) evaluating risk management needs for Product sales and feedstock supply; and (vii) establishing guidelines for minimizing costs of production and maximizing Net Prices (as hereinafter defined) with the objective of meeting financial goals of Purchaser and PRODUCER.

6. Section 4.7 entitled "Marketing Plan" of the aforesaid Agreement shall be modified to read as follows:

   No later than sixty (60) days prior to the commencement of each Contract Year, (or more often as appropriate in accordance with clause (iii) of Section 4.6), the Purchaser shall submit to the PRODUCER, a Marketing Plan (the "Marketing Plan") for such Contract Year. The Marketing Plan shall include *inter alia*:

   - A preliminary schedule of quantities of the Product to be purchased by the Purchaser, and its geographic allocation;
   - Projected ranges of prices for each market area;
   - Projected ranges of costs for transportation from Plant to each market area
   - The Calculated net Product prices FOB Plant;

2

- Parameters for allocating between of Spot and Term Sales;
- Parameters for determining the expected Weighted Average Life of Term Sales;
- Thresholds of marketing mix and pricing that would require consultation and approval of the Marketing Committee.

7. Section 4.9 entitled "Sales and Marketing" of the aforesaid Agreement shall be renumbered as Section 4.9 (a) and modified to add the following as Section 4.9(b):

(b) "Should Purchaser be instructed in writing by the Marketing Committee to proceed with a certain sales strategy or plan and should that sales strategy or plan be then, and remain, reasonably practicable and reproducible in the marketplace within a reasonable period of time specified in such instruction, but Purchaser fails to execute such sales strategy or plan within the reasonable time period specified in such instruction, without providing Producer in writing with a reasonable explanation for such failure, then Producer shall have the right, but not the obligation, to provide Purchaser with a Notice of Default under Section 17.1 (a) of this Agreement."

8. Section 5.1 (b) entitled "Quantity" of the aforesaid Agreement shall be modified to read as follows:

"(b) PRODUCER may subtract from the Total Annual Plant Production up to thirty million (30,000,000) Gallons of Ethanol each Contract Year for delivery to one or more Canadian refiner(s) pursuant to one or more written sales agreements entered into by PRODUCER with such Canadian refiner(s) prior to the Date of First Delivery ("Canadian Sales Agreement(s)"). PRODUCER shall provide Purchaser and the Marketing Committee with a copy of such Canadian Sales Agreement(s) at least sixty (60) calendar days prior to the estimated Date of First Delivery. Except for such Canadian Sales Agreement(s), PRODUCER shall not enter into any other sales commitments other than to Purchaser or extend or renew such Canadian Sales Agreement(s) without the Purchaser's prior written consent."

9. Section 10.3 entitled "Fee" of the aforesaid Agreement shall be modified to read as follows:

"PRODUCER shall pay to Purchaser the Fee in the amounts set forth in Section 7.4 above and in Schedule B hereto. The Fee will be paid through deductions by Purchaser from remittances to PRODUCER hereunder. No Fee shall be paid by PRODUCER to Purchaser for sales pursuant to the Canadian Sales Agreement(s) as detailed in Section 5.1 herein."

10. Section 13.3 entitled "Sales during Force Majeure" of the aforesaid Agreement shall be modified to read as follows:

3